UNITED STATES of America,
Appellee,

v.

Charles Anthony HARTFIELD,
Appellant.

No. 74–2191.

United States Court of Appeals,
Ninth Circuit.

March 12, 1975.

Alvin S. Michaelson (argued), Los Angeles, Cal., for appellant.

William D. Keller, U. S. Atty. (argued), Los Angeles, Cal., for appellees.

Before DUNIWAY and ELY, Circuit Judges, and SOLOMON,* Senior District Judge.

## OPINION

ELY, Circuit Judge:

Appellant Hartfield appeals from his conviction by a jury on one count of an indictment charging him with the attempted robbery of a savings and loan association while armed with a dangerous weapon, a violation of 18 U.S.C. § 2113(a) and (d). Sentenced to the custody of the Attorney General for a period of ten years, Hartfield is currently confined.

The evidence adduced at trial indicated that Hartfield entered a branch of the California Federal Savings and Loan Association (hereinafter "the Association") in Ontario, California at 9:30 a.m. on September 5, 1974. Pointing a gun at one of the Association's employees, Hartfield demanded, "Give me the money." It was explained to Hartfield that the particular Association office was strictly a loan branch and that no money was kept there. After repeating several times that he wanted the safe opened, Hartfield accepted the explanation and asked the employees who were present to give him the money from their pockets. Hartfield was in the Association office for approximately five to ten minutes and was described by the assistant vice president and manager of the loan office as appearing "hopped up" during the time.

Approximately fifteen minutes after the foregoing incident occurred at the loan office, a patrolman from the Upland Police Department observed a vehicle driven by a person matching the description of Hartfield, and the patrolman stopped the vehicle. Hartfield was

* The Honorable Gus J. Solomon, Senior United States District Judge, District of Oregon, sitting by designation.

placed under arrest and taken to the Ontario Police Station. During Hartfield's trial, his attorney offered to prove certain subsequent events, hereinafter described, but the trial judge refused to admit the proffered testimony.

The testimony sought to be introduced was as follows:

After arriving at the Ontario Police Station Hartfield was observed by Police Officer Chavis to be slumping out of his chair. Several officers attempted to keep Hartfield sitting upright in his chair and could not do so; consequently, Hartfield was placed on the floor to keep him from falling. According to Officer Chavis the appellant "went comatose." The Fire Department Rescue Service was summoned, arrived within several minutes, and spent about five minutes unsuccessfully attempting to revive Hartfield. Hartfield was then taken to the San Antonio Community Hospital, where he was admitted at 10:57 a.m. Hospital records were offered to prove that Hartfield was hospitalized for about one week, that he stated that he had possibly been given some LSD in something to drink, that he was admitted as the victim of a possible drug overdose, and that during the evening of the day of his admission he began to suffer hallucinations. Counsel for Hartfield also offered to produce Drs. Williamson and Campbell to testify as to their diagnosis and treatment of Hartfield at the hospital. All of this proffered testimony relating to Hartfield's condition after the time of his arrest was excluded by the trial judge and therefore never considered by the jury.

I. *The Court's Denial of the Appellant's Request for an Order Authorizing the Administration of an Electroencephalogram.*

Hartfield's first contention relates to the denial of defense counsel's motion requesting an order authorizing an examination of Hartfield by means of an electroencephalogram (hereafter "EEG").

After Hartfield had entered an initial plea of not guilty, the trial court, pursuant to 18 U.S.C. § 4244, appointed Dr. Marcus Crahan, a psychiatrist, to examine Hartfield to determine the latter's competency to stand trial. At the subsequent competency hearing, the court considered the report of Dr. Crahan, in which the psychiatrist had concluded that the defendant was in fact competent to stand trial. In questioning the doctor's conclusions, defense counsel referred the court to the following facts from the report:

1. "Defendant basically has no reflexes. He does not react to light when light is shown into his eyes. He has no response to the usual tests for reflex action."

2. "Knee jerks do not respond even by reinforcement. He is congenitally deaf in his left ear. He has a swollen right jaw and a history of head injury and convulsions. He denies knowledge of the robbery or the attempted robbery."

3. "He also seems to have comprehensive difficulties and appears to be a mental defective."

4. "He gives a history of a head injury in his youth in Texas. He felt that this may have affected his hearing and caused him to have blackouts. . . ."

5. "His pupils are fixed and his palletar reflexes are nonresponsive and this may suggest congenital syphilis."

After questioning Hartfield personally, the court ruled that he was competent to stand trial. Subsequently, the court inquired whether the appellant had any history of "Jacksonian epilepsy" and questioned him as to whether he had a history of convulsions. The district judge also asked whether Hartfield had been given an EEG examination. Since none had been conducted, government counsel agreed that a "brain wave test" would be appropriate to determine the existence, *vel non*, of epilepsy. It was stipulated and agreed that Dr. Malcolm

Valentine would be appointed to conduct a neurological examination of Hartfield. The district judge referred to his prior experience concerning some "encephalograms" that he had once had made on one of his clients and agreed that ". . . it would be pointless to have a trial if all the reasonable indicia point to lack of awareness."

Nevertheless, although there was considerable discussion in court concerning the appropriateness of an EEG test, Dr. Valentine neglected to conduct one. Rather a report was filed in which Dr. Valentine concluded:

"There were no complaints of other previous lapses of consciousness and there is no history of convulsive episodes or anything suggesting psychomotor episodes. . . . Although unhandicapped by an independent history, there is nothing to suggest from what the defendant tells me of a seizure disorder ,or anything remotely suggestive of temporal lobe epilepsy . . . *If there are any doubts, an EEG in both the sleeping and waking states might be helpful.* One cannot help noticing, however, similarity of the previous robbery with the present charge." (emphasis added).

In view of the district judge's earlier statements indicating the appropriateness of an EEG, and Dr. Valentine's statement that an EEG "might be helpful," Hartfield's counsel moved pursuant to 18 U.S.C. § 3006A(e) for an order authorizing the administration to Hartfield of the EEG examination. The court denied the motion, indicating that Dr. Valentine's report had not suggested the "necessity" of an EEG and that the report indicated there was "no doubt" as to the absence of an epileptic condition. Hartfield vigorously contends that the denial of this motion was error which seriously prejudiced him in his plans to offer a defense predicated upon a showing that he was suffering from a mental defect or incapacity that precluded criminal responsibility for the offense.

We consider the correctness of the court's ruling in light of the language of

18 U.S.C. § 3006A(e) and our decisions interpreting it. The relevant portion of the statute provides:

"Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary to an adequate defense may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court . . . shall authorize counsel to obtain the services."

18 U.S.C. § 3006A(e)(1). Since Hartfield's indigence is not contested, the "financially unable to obtain them" requirement of the statute is clearly satisfied. The critical question is whether or not the administration of an EEG was reasonably "necessary" to Hartfield's defense.

■ The test for deciding whether the district judge should have granted such a motion in these circumstances was set forth by our court in United States v. Bass, 477 F.2d 723 (9th Cir. 1973). There, the opinion reads:

"A clear standard for deciding what constitutes 'necessity' under § 3006A(e) has not yet been stated in this circuit. We agree with the views of Judge Wisdom, concurring in United States v. Theriault, 440 F.2d 713, 716–717 (5th Cir. 1971). The statute *requires* the district judge to authorize defense services when the defense attorney makes a timely request in circumstances in which a *reasonable attorney would engage such services for a client having the independent financial means to pay for them.*" (emphasis added).

477 F.2d at 725.

■ In light of the district judge's own suggestion that an EEG would be appropriate, the additional comment of Dr. Valentine, a court-appointed physician, that an EEG would be "helpful," Dr. Crahan's detailed findings as to lack of reflexive responses and in the further

light of Hartfield's unconsciousness and lengthy hospitalization shortly after the offense in question, we think it undeniable that any "reasonable attorney would engage such services for a client having the independent financial means to pay for them." This is particularly true when the relatively minimal cost of such an examination is considered in the context of an offense which, in this case, carried a possible penalty of ten years imprisonment. In fact, once the court-appointed physician had reported that an EEG would be "helpful" in arriving at a proper diagnosis, Hartfield's attorney, had Hartfield possessed the necessary financial means, might have been charged with legal incompetency had he failed to resort to the EEG and all other sophisticated diagnostic aids.

The absence of an electroencephalographic examination could have seriously prejudiced the defendant, because the only defense available to him was a defense that turned on his mental condition. The extent of such possible prejudice was magnified when subsequent rulings of the trial court excluded virtually all of Hartfield's evidence revealing his collapse and other symptomology immediately following the commission of the offense. The ruling of the District Court on the motion for a test by means of an EEG stripped him of his only plausible defense and was error under the test we enunciated in *Bass, supra*.

As Judge Wisdom said, concurring in United States v. Theriault, 440 F.2d 713, 717 (5th Cir. 1971), (an opinion that we expressly approved in *Bass*):

"The trial judge should tend to rely on the judgment of the attorney, who has the primary duty of providing an adequate defense. Such reliance is recommended by the difficulty of requiring the trial judge to take an adversary view of the case. Additionally it avoids forcing the defendant to reveal private information to the court in order to support the request for such services. Further it comes close

to putting the indigent defendant in the same position as a non-indigent defendant, where the defense attorney would determine whether to engage the services." (citations omitted).

Here, the trial judge erred in rejecting the judgment and the request of the defense attorney. This error was of such consequence that it, in and of itself, would compel the reversal of Hartfield's conviction.

■ Our determination of this issue is reinforced by a consideration of the Congressional purpose in enacting 18 U.S.C. § 3006A(e)[1] and the due process requirement of fair administration of justice, guaranteeing the crucial right of an indigent to reasonably fair equality with those who have adequate financial means to protect their rights. If the fairness of our system is to be assured, indigent defendants must have access to minimal defense aids to offset the advantage presented by the vast prosecutorial and investigative resources available to the Government. A contrary position might well result in a system wherein the outcome of criminal trials would be determined by the poverty of the accused rather than the integrity of the fact-finding process. While it is true that an indigent defendant is not entitled to everything that a very wealthy defendant might muster in his defense, here an indigent defendant sought an examination of such minimal expense that any defendant of even modest financial means would certainly have secured the benefit of such a diagnostic tool for himself.

II. *The Court's Exclusion of the Evidence Relating to Hartfield's Physical and Mental Condition.*

■ Hartfield's second argument relates to the district judge's decision to exclude all testimony relating to Hartfield's physical and mental condition immediately following the commission of

1. *See* United States v. Theriault, 440 F.2d 713, 716 (5th Cir. 1971) (Wisdom, J., concurring), for a more extensive analysis of the legislative history underlying 18 U.S.C. § 3006A(e).

the offense. The judge refused to admit this evidence as proof of drug intoxication rendering Hartfield incapable of forming specific intent, because the judge determined that "diminished capacity [is] not . . . the law of this Circuit." The trial judge refused to consider the evidence as proof of insanity on grounds that the testimony was immaterial unless the defense offered expert testimony to connect what happened to the defendant following the event to his mental competence at the precise time of the alleged crime. We conclude that while the proffered evidence may not have been admissible for the purpose of disproving the existence of specific intent, it should, under the law of our Circuit and the virtually uniform law of the other circuits, have been admitted on the issue of insanity and that the District Court committed reversible error in refusing to allow the jury to consider it.

 Turning our attention first to the question of whether the evidence was properly admissible to show that Hartfield lacked the mental capacity to form a specific criminal intent, it appears that the law of our Circuit was misapplied. It is clear that we follow the rule that in a prosecution for a specific intent crime, intoxication (although voluntary) which precludes the formation of the necessary intention may be established as a defense. Henry v. United States, 432 F.2d 114, 119 (9th Cir. 1970), opinion modified, 434 F.2d 1283 (9th Cir.), cert. denied, 400 U.S. 1011, 91 S.Ct. 576, 27 L.Ed.2d 625 (1971). The same rule is recognized in most other jurisdictions. *See generally* Annot. 8 A.L.R.3d 1236, 1246–57 (1966). Although it is therefore clear that the voluntary intoxication defense is recognized in this Circuit, here we are obliged to follow our court's decision in United States v. Porter, 431 F.2d 7 (9th Cir.), cert. denied, 400 U.S. 960, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970), which holds, apparently contrary to the position of several other circuits,[2] that the portion of 18 U.S.C. § 2113(a)

involved in the indictment before us does not require proof of a specific intent. Therefore evidence of voluntary drug intoxication could not be considered in this case to demonstrate lack of capacity to form specific intent because such an intent is not an element of the crime in question under our decision in *Porter*. *But cf.* United States v. Lilly, 512 F.2d 1259 (9th Cir. 1975).

However, the proffered evidence was nevertheless relevant to the issue of Hartfield's sanity at the time of the offense and should have been admitted for that reason. Hartfield's attorney indicated to the court that Drs. Williamson and Campbell could testify to Hartfield's condition forty-five minutes after the offense but that they could not state with medical certainty any conclusion as to Hartfield's mental condition at the time of the offense. Since Hartfield offered no testimony from Dr. Coburn, the one psychiatrist appointed in his behalf, the district judge held that the proffered evidence was immaterial since it was unconnected with any expert testimony as to Hartfield's insanity at the precise time the alleged offense occurred.

 When an accused offers some evidence to raise the issue of insanity, his sanity at the time of the offense becomes an element of the crime which, like all other elements of the crime, must be proved by the Government beyond a reasonable doubt. Doyle v. United States, 366 F.2d 394 (9th Cir. 1966). Only slight evidence is sufficient to raise the issue as to sanity for submission to the jury. Hall v. United States, 295 F.2d 26, 28 (4th Cir. 1961) quoted with approval in our case of Doyle v. United States, *supra*). "[W]hen insanity is in issue, 'any and all conduct of the person is admissible in evidence.'" United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969, 976–77 (1972) (en banc) (quoting A. Goldstein, The Insanity Defense 54 (1967), which cites to "1 Wigmore Evidence § 228 (1940) and numer-

---

2. Hamilton v. United States, 475 F.2d 512 (6th Cir. 1973); Caples v. United States, 391 F.2d 1018, 1022–23 (5th Cir. 1968).

ous cases"). "Any evidence of aberrant conduct or action, *whether before or after the act charged*, is accordingly admissible under the plea," United States v. James Edwin Smith, 507 F.2d 710 (4th Cir. 1974) (emphasis added), and the trial judge should be free in his admission of all possibly relevant evidence. Pope v. United States, 372 F.2d 710, 736 (8th Cir. 1967) (en banc), remanded on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968). We believe that Hartfield's offer of proof of his mental symptomology and subsequent hospitalization was abundantly sufficient to raise the issue of his sanity so as to bring this case within the rule requiring the admission of such evidence. *See also* Gordon v. United States, 438 F.2d 858, 883–86 (5th Cir. 1971), cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1972), United States v. Chandler, 393 F.2d 920 (4th Cir. 1968) (en banc). We have found no authority for the proposition that so-called expert testimony is required as indispensable to rebutting prosecution proof of sanity.[3]

In Davis v. United States, 364 F.2d 572 (10th Cir. 1966), the appellant offered evidence that she had periods of blackout from time to time, but none of her witnesses testified as to her condition at the particular time of the several offenses in question. An instruction given in that case was held to be "too restrictive in that it limits the accused's evidence as to her mental condition at the time of the commission of the crimes charged. Such evidence may instead relate to conditions existing *both before and after the crime* as held in Phillips v. United States, 311 F.2d 204 (10th Cir. [1962]). 364 F.2d at 574–75 (emphasis added).

██ Expert testimony as to the defendant's mental condition at the *exact time* of the offense, while desirable from the defendant's standpoint, is not necessarily essential. Evidence of a defendant's mental condition reasonably near the time when the offense is committed, whether before or after, is also admissible and may be sufficient to support an inferential conclusion as to the defendant's mental status at the critical time. Here, the evidence offered by Hartfield was sufficient to raise the insanity issue; therefore, the evidence should have been received. The exclusion of all the proffered testimony relating to Hartfield's mental symptomology and his hospitalization immediately following the robbery prejudicially deprived Hartfield of material evidence critical to his only possible defense, evidence which, once exposed, might possibly have created a foundation for favorable defense testimony by other medical experts given the opportunity to review the precise sworn testimony along with other relevant history.

Reversed and remanded.

SOLOMON, District Judge (concurring):

I concur in the result.

---

**3.** We also find no authority for the proposition that expert psychiatric testimony is required to raise the issue of insanity. Indeed, cases can easily be imagined wherein the degree of mental impairment is so grave and manifest that any layman who had been exposed to the accused could testify to the fact of undeniable insanity. Here, in addition to lay testimony, Hartfield offered the testimony of two physicians whom, although not purporting to be psychiatrists, were entirely competent to testify as to the authenticity of Hartfield's hospitalization and the general nature of his mental condition.