UNITED STATES of America, Appellee,

v.

David DURANT, Appellant.

No. 283, Docket 76–1198.

United States Court of Appeals, Second Circuit.

Argued Oct. 1, 1976.

Decided Nov. 24, 1976.

---

Phylis Skloot Bamberger, New York City (The Legal Aid Society, William J. Gallagher, New York City, on the brief), for appellant.

Jonathan M. Marks, Asst. U.S. Atty., Brooklyn, N.Y. (David G. Trager, U.S. Atty., E.D.N.Y., Kenneth J. Kaplan, Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for appellee.

Before FEINBERG, GURFEIN and VAN GRAAFEILAND, Circuit Judges.

FEINBERG, Circuit Judge:

This case presents the important issue of the proper standard for appointment of a defense expert under the Criminal Justice Act of 1964, 78 Stat. 552 (1964), as amended, 18 U.S.C. § 3006A (1970). David Durant appeals from a judgment of conviction for armed bank robbery, 18 U.S.C. § 2113(d), entered in the United States District Court for the Eastern District of New York after a jury trial before Mark A. Costantino, J. The only claim on appeal is that the district court's failure to grant a defense request for appointment of a fingerprint expert was error. We hold that it was, and remand for a new trial.

## I

Because Durant does not argue that the evidence was insufficient, we may summarize the facts only briefly. On October 10, 1975, three masked men with loaded guns robbed a branch of the Chase Manhattan Bank. One remained near the entrance of the bank, one went to the officers' section, and the third vaulted the teller's counter and took about $3,250. On October 21, the grand jury indicted appellant, his brother-in-law, Michael Reed, and a third person.[1] Reed pleaded guilty in November, and the court appointed counsel for Durant, an indigent, under 18 U.S.C. § 3006A. At a pretrial proceeding on January 13, 1976, Durant's counsel advised the court that the Government apparently planned to use fingerprints in its case and asked for appointment of a defense expert to examine the prints. The prosecutor objected, as follows:

---

1. The indictment referred to him as "JOHN DOE, also known as 'Henry'." His identity does not otherwise appear in the record.

We have an expert, he's employed by the FBI. I think it is ludicrous that the Government should pay for a second expert. . . . He could cross-examine our expert.

The judge denied the request, advising defense counsel to cross-examine the government expert to ascertain discrepancies.

At the trial three weeks later, two accomplices identified Durant as one of the robbers, but their credibility was open to sharp attack. One was co-defendant Reed, who faced a possible 20-year sentence on his guilty plea and had not yet been sentenced.[2] On cross-examination, Reed also admitted various falsehoods. The other accomplice was one Ronald Freeman, in whose apartment the robbers met to divide up the stolen money. Freeman had agreed to cooperate with the Government after an FBI agent told him that he would be charged as an accomplice and could get up to 20 years in prison. Freeman was not indicted. Freeman also faced a charge of violating probation that had been imposed on a conviction for armed theft.

Fingerprint evidence was thus very important at the trial. The Government first offered the testimony of the agent who had lifted a partial latent fingerprint from the top of the glass partition where one of the robbers had vaulted the counter. Then, fingerprint expert John C. Saunders, employed by the FBI, testified that a comparison of this latent print with the known thumb print of appellant showed that the two prints were from the same finger. Saunders said that there were 14 points of identity between the two prints and that seven points of identity were enough to make a positive identification. Defense counsel attempted to challenge this testimony by cross-examination, as the judge had directed him to do. Saunders admitted without qualification that he had seen as many as 55 points of identity in comparing fingerprints in other instances, but maintained that he and the FBI did not have a rule requiring any specific number of points. Saunders also admitted that "You need an expert" to identify points of identity. He also said it was not possible for him to make a mistake and that he did not know how long the print was on the window. On redirect, Saunders testified that the print was less than a week old. Copies of the comparison prints were submitted to the jury, but only nine points of identity were marked.

In his first summation, the prosecutor strongly emphasized the fingerprint evidence, mentioning it no less than eight times. This was understandable, in view of the vulnerability of the testimony of accomplices worried about future sentence disposition and anxious to cooperate with the Government. In reply, defense counsel contended that Saunders was psychologically predisposed to his findings because he was an FBI agent and because the only prints sent to him were appellant's and Reed's. Counsel argued that Saunders' statement that he never made a mistake should not be taken literally. In rebuttal, the prosecutor again stressed the fingerprint evidence:

The defense would have you believe that this testimony concerning the fingerprint is not conclusive when a man of eighteen and a half years of experience, who's been doing this for half his life, this is his job, he sits there and he analyzes fingerprints, he told you millions of fingerprints, and you think this man is going to put his reputation as a professional on the line, traveling from Washington to New York, he's going to get on the stand and he's going to identify a fingerprint as positive? He doesn't say maybe. He doesn't even say seventy-five per cent. He says this is a positive identification. This fingerprint is the same as the fingerprint on Durant's card. The same. And he says, "All I need is seven points." You have a hundred points, you can have fifty points, you have twelve points. We have fourteen in this case.

2. After trial, Reed received a sentence of six months in prison and four and one half years on probation.

And I made a nice little diagram, if you want to use it, and he put nine points on.

Now, if there were twenty-seven points, you'd have a tough time putting the numbers in. These are the ones that might have been visible on the diagram. But he says fourteen points and he says a positive identification.

I suggest to you that there's no more powerful evidence in the law than fingerprint examination.

The prosecutor also repeatedly implied to the jury that Reed would receive a 20-year sentence.[3] During their deliberations the jury requested, and received, the fingerprint exhibits.[4]

## II

On appeal, Durant claims that denial of his pre-trial request for a fingerprint expert was reversible error. The Criminal Justice Act of 1964, as amended, provides that:

Counsel for a defendant who is financially unable to obtain investigative, expert, or other services necessary to an adequate defense in his case may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary . . . the court . . . shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1).[5] Use of this section of the Criminal Justice Act to obtain expert assistance has been relatively sparse, compared with applications for court-appointed counsel. Thus, for fiscal year 1974, the total amount expended nationally for services of experts was approximately $190,000 compared with payments of over $10 million thus far to court-appointed private attorneys for that year.[6] Nevertheless, a number of decisions deal with the key phrase in this section of the Act, "necessary to an adequate defense."

One of the earliest discussions of the meaning of that standard appears in Judge Bright's opinion for the Eighth Circuit in *United States v. Schultz*, 431 F.2d 907 (1970). In that case, the district judge had denied defendant's request that the court appoint, under 18 U.S.C. § 3006A(e), an "independent psychiatrist for the purpose of supporting his defense of lack of requisite mental capacity" at the time of the alleged crime of bank robbery. The court first observed that the issue was apparently "a case of first impression" for "the federal courts of appeal," and then noted that:

No standard can be arbitrarily articulated covering all circumstances under which an accused demonstrates his entitlement under the Act to services of experts to present an adequate defense.

431 F.2d at 909. The court went on to phrase the applicable test as follows:

While a trial court need not authorize an expenditure under subdivision (e) for a mere "fishing expedition", it should not withhold its authority when underlying facts reasonably suggest that further exploration may prove beneficial to the ac-

---

**3.** In fact, Reed later received a far more lenient sentence. See note 2 supra.

**4.** These included the latent print, Durant's conceded prints, and a blowup comparing the two.

**5.** Compensation for experts under the Act is provided for in subsections (2) and (3) of § 3006A(e):

(2) Without prior request.—Counsel appointed under this section may obtain, subject to later review, investigative, expert, or other services without prior authorization if necessary for an adequate defense. The total cost of services obtained without prior authorization may not exceed $150 and expenses reasonably incurred.

(3) Maximum amounts.—Compensation to be paid to a person for services rendered by him to a person under this subsection, or to be paid to an organization for services rendered by an employee thereof, shall not exceed $300, exclusive of reimbursement for expenses reasonably incurred, unless payment in excess of that limit is certified by the court, or by the United States magistrate if the services were rendered in connection with a case disposed of entirely before him, as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit.

**6.** Annual Report of the Director of the Administrative Office of the United States Courts 1975, at 549 and Exhibit C–1.

cused in the development of a defense to the charge. Considering the purpose of § 3006A(e) of the Criminal Justice Act to provide the accused with a fair opportunity to prepare and present his case, the application of the accused's counsel for such services must be evaluated on a standard of reasonableness. [Footnote omitted.]

Id. at 911. Applying this standard, the court reversed the conviction and ordered a new trial.

Less than a year later, the issue was again thoroughly discussed in Judge Wisdom's concurring opinion in *United States v. Theriault*, 440 F.2d 713, 716 (5th Cir. 1971). In that case, which also involved denial of a defense request to authorize employment at government expense of a psychiatrist, the Fifth Circuit reversed a conviction. The majority opinion did not discuss the meaning of the phrase "necessary to an adequate defense" other than to point out that this test is "not susceptible of arbitrary articulation but can best be developed on a case by case basis." Id. at 715. Judge Wisdom, however, did explore that question at length and concluded that the statute required

> authorization for defense services when the attorney makes a reasonable request in circumstances in which he would independently engage such services if his client had the financial means to support his defenses.

Id. at 717. Support for this formulation was found in the legislative history of the statute and in the constitutional imperative that a criminal defendant not be prejudiced by his indigence.

In *United States v. Bass*, 477 F.2d 723, 725 (1975), which also involved a defense request for appointment of a psychiatrist, the Ninth Circuit cited Judge Wisdom's

views with approval, and phrased the applicable standard as follows:

> The statute requires the district judge to authorize defense services when the defense attorney makes a timely request in circumstances in which a reasonable attorney would engage such services for a client having the independent financial means to pay for them.

Because the trial judge had erroneously denied the defense request, the judgment of conviction was reversed.

We believe that these statements of the applicable test are all essentially similar,[7] and reflect a common concern for fairness at the trial of a criminal offense. We recognize, as did the Fifth and Eighth Circuits, that it is difficult to spell out a rigid rule in great detail. Yet, the purpose of the Act, confirmed by its legislative history,[8] is clearly to redress the imbalance in the criminal process when the resources of the United States Government are pitted against an indigent defendant. Therefore, the phrase "necessary to an adequate defense" must be construed with this commendable purpose in mind. "Necessary" should at least mean "reasonably necessary," and "an adequate defense" must include preparation for cross-examination of a government expert as well as presentation of an expert defense witness. This does not mean that applications for expert assistance should be granted automatically, or that frivolous applications should be granted at all. But it does mean that the Act must not be emasculated by niggardly or inappropriate construction.

With this approach in mind, we turn to what happened here. The prosecutor's argument that the government expert was employed by the FBI and that it was "ludicrous" for the Government to pay "for a second expert" was wholly misplaced. The

7. The Government apparently agrees, since it cites all of them for the applicable standard.

8. See Letter of Transmittal from President Kennedy of March 8, 1963, 1964 U.S.Code Cong. and Admin.News p. 2993; *United States v. Hartfield*, 513 F.2d 254, 258 (9th Cir. 1975).

See also Kutak, The Criminal Justice Act of 1964, 44 Neb.L.Rev. 703 (1965); Note, The Indigent's Right to an Adequate Defense: Expert and Investigational Assistance in Criminal Proceedings, 55 Cornell L.Rev. 632 (1970).

purpose of the Criminal Justice Act was to have the Government do just that in a proper case. The correct inquiry was whether this was such a case. Where the identification of the defendant as a culprit is contested, fingerprint evidence is likely to be pivotal.[9] This was such a case. Both counsel in summation emphasized the fingerprint evidence. But defense counsel had to get along without his own expert. Had one been authorized, counsel might have been able to make several challenges. Since the latent print was only a partial print and blurred, an expert could have advised whether it was possible to make any identification at all from it. Moreover, eminent fingerprint authority indicates that there may be "some cases" in which "a difference of opinion can arise" regarding the identity of even more discernible prints.[10] Also, another expert may well have thought that the number of identical characteristics required for concluding that two prints were the same were greater than the 14 Saunders testified to, or that some of the 14 were not identical. At the very least, an expert could have educated defense counsel as to the technicalities of the field to make cross-examination more effective.

The Government argues to us that the appointment of a defense expert might be "strategically foolish . . . [because] the report of such an expert, which experience suggests in all probability would have supported the Government expert, would have been available to the prosecution, and the prosecution could then call the expert as its own witness."[11] We have no basis for accepting the Government's prediction that a defense expert's report would "in all probability" have supported Saunders. In any event, the adversary system, which the Criminal Justice Act is designed to implement, leaves such choices to the defense. The Government also contends that the principal authorities appellant relies on all involve psychiatric and related services where a colorable claim of insanity was raised.[12] To be sure, the imprecise state of psychiatry makes that field especially prone to differing professional opinions, but the need for a defense expert can be equally present in other areas even though there may in general be less room for difference of opinion. It is true that there are not many reported decisions involving a request for a fingerprint expert. We do not know whether this means that few such requests are made or that they are routinely granted, or both.[13] The few opinions bearing on the point are, for the most part, favorable to appellant's position. They are, of course, not controlling, but they support the view

9. Defense counsel cannot be held accountable for not having outlined the identity defense more clearly when he requested appointment of an expert, because the judge failed to conduct the proceeding ex parte. The Act, see text accompanying note 5 supra, calls for an ex parte application to protect the defense from premature disclosure to the prosecution of defense strategy. H.R.Rep. No. 864, 1964 U.S. Code Cong. & Admin.News p. 2990; *United States v. Sutton*, 464 F.2d 552 (5th Cir. 1972) (per curiam); *Marshall v. United States*, 423 F.2d 1315 (10th Cir. 1970).

10. A. Moenssens, R. Moses & F. Inbau, Scientific Evidence in Criminal Cases 345 (1973). See also id. at 307:

The defense attorney who relegates omnipotence to the state's fingerprint expert often does his client a disservice. On the other hand, in order to effectively cross-examine the expert, the attorney must understand the subject matter himself.

11. Government brief at 7.

12. E. g., *United States v. Hartfield*, 513 F.2d 254 (9th Cir. 1975); *United States v. Bass, supra; United States v. Theriault, supra.*

13. In a letter to this court, the Government estimates "that not more than one in ten defendants, indigent or non-indigent, utilizes the services of a fingerprint expert in cases in which fingerprint evidence is offered by the Government." See also Oaks, Improving the Criminal Justice Act, 55 A.B.A.J. 217, 218–19 (1969).

The Federal Defender Services Unit of the Legal Aid Society has advised us, also by letter, that in the past year it has engaged the services of a fingerprint expert for an indigent defendant on four occasions. Because the Unit has a budget line for experts, no court authorization was required or sought.

that excessive rigidity in considering such a request is not the rule.[14]

In sum, we believe that the judge should have granted the defense request for appointment of a fingerprint expert. Under the circumstances, we reverse the judgment of conviction and remand for a new trial. We have given serious consideration to merely remanding for appointment of an expert whose report could then be considered by the trial court or by us in deciding whether to grant a new trial. But we believe this misconceives the purpose of providing expert service to the defense. It is not to supply either the trial or appellate court with anything, but to furnish defense counsel expert information to use as he sees fit. It may be that such expert advice will prove to be of little or no assistance, but on this record we can hardly say that. Furthermore, even if the new trial ultimately proves wasteful because an appointed expert does not help the defense, none of the blame for the waste will rest with the defendant. Under the circumstances, we believe it appropriate to order a new trial, as was done in *United States v. Theriault, supra, United States v. Schultz, supra,* and, apparently, in *United States v. Bass, supra.*

Judgment reversed and case remanded for a new trial.

---

**14.** See *Bradford v. United States,* 413 F.2d 467, 473–75 (5th Cir. 1975). See also *United States v. Grammer,* 513 F.2d 673 (5th Cir. 1973) (fingerprint expert appointed); *United States v. Moseley,* 450 F.2d 506, 509 (5th Cir. 1971), and *Ray v. United States,* 367 F.2d 258, 263–67 (8th Cir. 1966) (court assumes appointment of fingerprint expert necessary). But cf. *United States v. Jones,* 320 F.Supp. 901, 902 (E.D. Tenn.1971) (expert apparently requested only by post-trial application).