**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jessie OLIVER and Gregory Cooper, Defendants-Appellants.**

**Nos. 870, 988, Dockets 79–1438, 79–1447.**

United States Court of Appeals, Second Circuit.

Argued March 19, 1980.

Decided July 14, 1980.

---

James P. Harrington, Buffalo, N. Y., for appellant Oliver.

Patrick J. Baker, Buffalo, N. Y., for appellant Cooper.

Michael A. Brady, Asst. U. S. Atty., Buffalo, N. Y. (Richard J. Arcara, U. S. Atty. for the Western Dist. of New York, Buffalo, N. Y., of counsel), for plaintiff-appellee.

Before WATERMAN, MANSFIELD and TIMBERS, Circuit Judges.

MANSFIELD, Circuit Judge:

Gregory Cooper and Jessie Oliver, who were named with Ethel Mae Ridgeway[1] in a four-count indictment charging bank robbery, jointly appeal from judgments entered in the Western District of New York by Judge John T. Elfvin convicting each, after separate jury trials, of one count of aggravated bank robbery, 18 U.S.C. § 2113(d), and one count of conspiracy to commit bank robbery, 18 U.S.C. § 371.[2] The convictions occurred after Oliver's trial was severed from that of his co-defendants and each was tried before a separate jury in October and November 1979. We affirm Oliver's conviction, reverse Cooper's and remand the latter's case for a new trial.

On June 27, 1979, the West Utica Street office of the Liberty National Bank, Buffalo, New York, was robbed by three black individuals who used hand guns to hold up

---

1. The jury was unable to reach a verdict with respect to defendant Ridgeway.

2. Title 18 U.S.C. §§ 2113(a) and (d) provides:
"§ 2113. *Bank robbery and incidental crimes*
"(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or
"Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny—
"Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.
 * * * * * *
"(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this, section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both."

the bank personnel, took approximately $12,355 and left in an automobile driven by a black woman. On August 8, 1979, Oliver was taken into custody by two FBI agents. After waiving his *Miranda* rights, he related his participation and that of Cooper and Ridgeway in the robbery. After being indicted, Oliver moved to suppress this statement. At the suppression hearing one of the FBI agents testified as to the circumstances of the confession, detailing his impressions of Oliver's appearance and abilities. The suppression motion was denied.

On October 2, 1979, Oliver pleaded guilty to count two of the indictment which charged bank larceny, 18 U.S.C. § 2113(b), pursuant to a plea bargain agreement which provided that the other counts would be dismissed at the time of sentencing in exchange for Oliver's promise to testify truthfully at the trial of his co-defendants and to assist the government in identifying a fourth individual involved in the bank robbery. Before accepting Oliver's guilty plea, Judge Elfvin placed Oliver under oath and questioned him about his involvement in the robbery.

The trial of Cooper and Ridgeway followed during the period October 17–22, 1979. Three bank employees who had been on duty on June 27 described the robbery. Although one employee (Sally Panepinto) described the general appearance of one of the robbers, neither she nor another employee (Anne Lindemann) could identify the defendants. A third employee (Denise Cook) described one of the robbers who jumped the counter and, although unable to identify him at trial, had selected a "mug-shot" type of photo of Cooper from an array as the person whom she thought was one of the robbers. The photo was received in evidence. Two witnesses who were out-

side of the bank immediately after the robbery testified to seeing black individuals flee the scene in a gold colored car bearing a certain Colorado license plate number. Another, who was acquainted with Oliver, testified to seeing Oliver and Ridgeway seated in a beige colored auto, bearing Colorado plates, with two other black persons in a parking lot near the bank. On June 30, 1979, three days after the robbery, Cooper bought a 1979 Chevrolet Monte Carlo car, paying cash on July 2, 1979, of which approximately $2,000 consisted of consecutively numbered $100 bills.

During the trial of Cooper and Ridgeway, Oliver was brought before the court and examined outside the presence of the jury because of concern that he may have changed his mind and might not testify. Under oath Oliver admitted his involvement in the robbery and detailed the participation of his co-defendants. Yet when called to testify before the jury the next morning he refused to answer any questions at all. After excusing the jury Judge Elfvin informed Oliver that, contrary to what his attorney may have advised him, Oliver did not have a Fifth Amendment privilege, and that his refusal to testify would constitute a breach of his plea agreement. Oliver nevertheless persisted in his refusal to answer any questions and he was excused. At that point Oliver's attorney asked permission to withdraw, and new counsel was appointed.

The Government then offered against Cooper, over his objection, Oliver's written statement detailing Cooper's participation in the robbery, which the court received in evidence against Cooper under Fed.Rule of Evid. 804(b)(3).[3] James Matthews, an acquaintance of Cooper and Oliver, testified

---

3. Fed.R.Evid. 804(b)(3), as one of the exceptions to the hearsay rule, provides:

"(b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \* \* \* \*

"(3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to sub-

ject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." (Footnote omitted).

that in mid-June 1979, Cooper told him as they were driving by that the bank would be "sweet to knock off," that in early July he saw Cooper in a new 1979 Monte Carlo, and that Cooper stated that he had robbed the bank.

On November 5, 1979, after the jury trying Cooper found him guilty, Oliver was permitted to withdraw his guilty plea and stand trial. At his trial his confession was received in evidence against him. Following a jury verdict finding him guilty, Judge Elfvin sentenced both defendants, entering the judgments of conviction from which they jointly appeal.

## DISCUSSION

*Oliver*

■ Title 18 U.S.C. § 4244 provides for the psychiatric examination of an accused where there is reasonable cause to believe he is incompetent to understand the proceedings or assist in his own defense.[4] A defendant is considered competent if "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and . . has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). See also, *United States v. Sullivan*, 406 F.2d 180 (2d Cir. 1969). Guided by this test the judge must exercise his discretion to determine whether there is "reasonable cause" to believe that the defendant may be incompetent. *Newfield v. United States*, 565 F.2d 203, 206 (2d Cir. 1977). See also *United States v. Hall*, 523 F.2d 665, 667 (2d Cir. 1975); *United States v. Vowteras*, 500 F.2d 1210, 1212 (2d Cir.), *cert. denied*, 419 U.S. 1069, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974); *Zovluck v. United States*, 448 F.2d 339, 342–43 (2d Cir. 1971), *cert. denied*, 405 U.S. 1043, 92 S.Ct. 1327, 31 L.Ed.2d 585 (1972); *Mirra v. United States*, 379 F.2d 782, 787 (2d Cir.), *cert. denied*, 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967).

■ The record here discloses no abuse of discretion by Judge Elfvin in making this determination. Prior to trial Oliver's counsel[5] moved to have him examined to determine pursuant to § 4244 his competency to stand trial. The supporting affidavit indicated Oliver's history of heavy drug use,[6] lapses of memory, unresponsiveness, inconsistent answers during interviews with counsel, low intelligence, and unexplained refusal to testify at the trial of his co-defendants. The record, however, reveals that Oliver's answers, although short, were responsive and evidenced no confusion or lack of understanding. Both during his trial and at the trial of his co-defendants Oliver demonstrated his understanding of the proceedings. Judge Elfvin had ample opportunity to observe him and directly questioned him. Before concluding that Oliver "appeared . . . to be alert and

---

**4.** Title 18 U.S.C. § 4244 provides in pertinent part:

"Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his men-

tal condition by at least one qualified psychiatrist, who shall report to the court. . . ."

**5.** The pretrial motions upon which Oliver bases this appeal were made by Oliver's new counsel, appointed after withdrawal of his first appointed counsel when Oliver refused to testify at his co-defendant's trial.

**6.** A motion for psychiatric examination under 18 U.S.C. § 4244 must be accompanied by a factual showing of probable cause. The trial court may, within its discretion take evidence on any issues of fact raised by the motion. *United States v. Hall*, 523 F.2d at 667. See also *United States v. McEachern*, 465 F.2d 833, 837 (5th Cir.), *cert. denied*, 409 U.S. 1043, 93 S.Ct. 539, 34 L.Ed.2d 494 (1972).

abreast of what was going on" Judge Elfvin justifiably relied on his extended observations of Oliver in deciding that he had sufficient mental capacity to stand trial. See *Riccardi v. United States*, 428 F.Supp. 1059, 1065 (E.D.N.Y.), *affd.*, 573 F.2d 1294 (2d Cir. 1977); *United States v. Vowteras, supra*, 500 F.2d at 1212; *Zovluck v. United States, supra; United States v. Sullivan, supra*, 406 F.2d at 185; *Mirra v. United States, supra*, 379 F.2d at 787; 81 Harv.L. Rev. 454, 469 (1967). Oliver's intelligent responses to questions put to him by the court provide further evidence of his competency. See *Falu v. United States*, 308 F.Supp. 1051, 1052 (S.D.N.Y.), *affd.*, 421 F.2d 687 (2d Cir. 1969).

■ Oliver's assertion of his history of heavy drug use called for more careful scrutiny of his claim despite the "apparent regularity of the proceedings," *Wojtowicz v. United States*, 550 F.2d 786, 790 (2d Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2938, 53 L.Ed.2d 1071 (1977). However, drug use does not *per se* render a defendant incompetent to stand trial. *United States ex rel. Fitzgerald v. LaVallee*, 461 F.2d 601, 602 (2d Cir.), *cert. denied*, 409 U.S. 885, 93 S.Ct. 121, 34 L.Ed.2d 142 (1972). The use of drugs is merely a relevant factor in the trial judge's determination. Neither the FBI agents who arrested Oliver nor Judge Elfvin, who had extensive opportunity to observe Oliver, noted any behavior attributable to drug use which hampered Oliver's ability to comprehend the proceedings.

The testimony at trial of Dr. Ralph Sibley, a clinical psychologist revealed Oliver's low intelligence and his poor reading and writing abilities.[7] However, the tests administered to Oliver did not show that he was unable to understand the proceedings against him. His problem was inability to express himself as articulately as might be desired, not an inability to understand the proceedings or to consult with his counsel. The district court therefore acted within its discretion in concluding that there was not reasonable cause to believe that Oliver might be incompetent.

Oliver next contends that the district court erred in denying his application under 18 U.S.C. § 3006A(e) for authority to engage an expert to examine and testify regarding his competence to stand trial. Section 3006A(e) provides in relevant part:

"Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for an adequate defense may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court . . . shall authorize counsel to obtain the services."

This section was designed to "redress the imbalance in the criminal process when the resources of the United States Government are pitted against an indigent defendant." *United States v. Durant*, 545 F.2d 823, 827 (2d Cir. 1976).

■ While there have been attempts to enunciate precise requirements to be met by the indigent defendant seeking additional services, *United States v. Chavis*, 476 F.2d 1137 (D.C.Cir.1973), most courts rely on the judgment of the defense attorney if he makes a reasonable request in circumstances in which he would independently engage such services if his client was able to pay for them. See *United States v. Durant, supra; United States v. Bass*, 477 F.2d 723 (9th Cir. 1973); *United States v. Theriault*, 440 F.2d 713, 716–17 (5th Cir. 1971) (concurring, Wisdom, C. J.); *United States v. Schultz*, 431 F.2d 907 (8th Cir. 1970). Although the legislative history of § 3006A supports a liberal attitude toward these indigent requests,[8] a judge is still

---

7. Oliver's IQ on the Wechsler Adult Intelligence Scale was measured at 68, in the bottom one percent of the population.

8. See 1964 H.R.Rep.Nos.864 and 1709, 88th Cong., 2d Sess. (1963), reprinted in U.S.Code Cong. & Admin.News 1964, pp. 2990–3003: e.

g., Letter of Transmittal from President Kennedy of March 8, 1963, *id.* at 2993. See also 55 Cornell L.Rev. 632 (1970).

obligated to exercise his discretion in determining whether such services are necessary. As we pointed out in *United States v. Durant*, 545 F.2d 823, 827 (2d Cir. 1976):

"[T]he phrase 'necessary to an adequate defense' must be construed with this commendable purpose in mind. 'Necessary' should at least mean 'reasonably necessary,' and 'an adequate defense' must include preparation for cross-examination of a government expert as well as presentation of an expert defense witness. This does not mean that applications for expert assistance should be granted automatically, or that frivolous applications should be granted at all. But it does mean that the Act must not be emasculated by niggardly or inappropriate construction." See also *United States v. Moten*, 564 F.2d 620, 629 (2d Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977).

■ In the present case there was support for Judge Elfvin's decision against authorizing expert services. He concluded from his own questioning and observation of Oliver that he was competent to stand trial. Moreover, he did permit during trial an intelligence examination to be made by Dr. Sibley of Oliver, which, while revealing a low IQ, did not provide sufficient grounds to believe that Oliver was incompetent. Finally, Oliver makes no showing of prejudice. Testimony concerning Oliver's low IQ and reading ability was introduced at trial. Unlike the defendant in *United States v. Durant*, 545 F.2d 823 (2d Cir. 1976), where the denial of a request for the services of a fingerprint expert was held to be prejudicial because the evidence was likely to be "pivotal," *id.* at 828, Oliver fails to show that the requested expert services were reasonably necessary to his defense.

■ Nor did the trial judge err in refusing to reopen the suppression hearing. Before a confession may be introduced against a defendant he must be accorded the "right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." *Jackson v. Denno*, 378 U.S. 368, 376–77, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964). Here, upon his motion to suppress, Oliver received a fair hearing in September, 1979, before the trial of Cooper and Ridgeway. At that hearing the issues regarding Oliver's intelligence, literacy and drug use were explored and were the subject of cross-examination of the FBI agent who took his confession. In addition, Judge Elfvin had before him Oliver's statement and was able to appraise it, including his childlike handwriting and spelling errors, in determining his capacity and the voluntariness of his action. No new evidence of material significance was offered in support of the motion to reopen. The surrounding circumstances having thus been explored by the court, the decision not to reopen did not constitute an abuse of discretion.

### *Cooper*

Cooper claims that the admission of Oliver's written confession into evidence against him at trial, without his being afforded an opportunity to cross-examine Oliver, was reversible error because the statement did not qualify as a statement against penal interest under F.R.Evid. 804(b)(3), pursuant to which it was admitted by the trial court, and it violated his right of confrontation under the Sixth Amendment. We agree on both counts.

Before a statement may be received as one against penal interest under Rule 804(b)(3) it must be shown (1) that the declarant is "unavailable" as a witness, (2) that the statement is sufficiently reliable to warrant an inference that "a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true," and (3) that "corroborating circumstances clearly indicate the trustworthiness of the statement." Unavailability is defined in Rule 804(a) as including one or more of five situations, of which the only pertinent one here (upon which the Government relies) is a provision to the effect that a witness is unavailable when he "persists

in refusing to testify concerning the subject matter of his statement despite an order of the court to do so." The Advisory Committee Note to Rule 804(a)(2) further indicates that the witness, to be unavailable, must refuse to testify "despite judicial pressures to do so."

In the present case, Judge Elfvin informed Oliver that he had no Fifth Amendment privilege not to testify and that his refusal would nullify his plea bargain, permitting the Government to prosecute him on all the original counts of the indictment. This clearly constituted judicial pressure upon Oliver to testify. However, the court never *ordered* him to testify, which is an essential requisite to the invocation of Rule 804(a)(2). It is always possible that a recalcitrant witness who does not respond to judicial pressure will testify when ordered to do so rather than face contempt proceedings for refusal to obey the court's order. Once ordered to testify, a recalcitrant witness who has been bent on helping a co-defendant by not testifying may then point to the court's order as forcing him to do so.

In addition, the circumstances surrounding Oliver's statement, while precluding him from successfully claiming it was involuntary, did not render it trustworthy within the meaning of Rule 804(b)(3). Statements given by a person held in custody, which implicate others, must be viewed with the same strict scrutiny that applies in weighing accomplice testimony. At the time when Oliver gave his statement to the FBI agent he was under arrest, facing a probable long term prison sentence for a bank robbery. He was a person of low intelligence who may have correctly anticipated that the Government had evidence sufficient to convict him. The FBI agents advised him that he was under arrest, that he faced a possible jail sentence of up to 25 years and that if he cooperated his cooperation would be made known to the United States Attorney with a view to gaining leniency. His statement may thus have been motivated in part by the prospect of severe punishment for his crime if he did not cooperate and the desire to gain favor with the Government in the hope of obtaining release or reduced punishment. While his statement may also have been truthful, these other factors could have influenced him to incriminate Cooper. Under these circumstances we cannot say with certainty that a reasonable man in his position would not have made the statement unless he believed it to be true, or that "corroborating circumstances clearly indicate the trustworthiness of the statement." [9]

In view of our doubt regarding the trustworthiness and reliability of Oliver's statement, to admit it without giving Cooper the opportunity to cross-examine Oliver would also violate Cooper's fundamental Sixth Amendment right to be confronted with the witnesses against him.

9. In making changes in proposed Rule 804(b)(3), the House Judiciary Committee first amended it to include a sentence making inadmissible a confession or statement made by a co-defendant, offered against an accused in a criminal case, implicating both himself and the accused. This sentence was deleted by the Conference Committee because of the general approach of the Federal Rules of Evidence to avoid codifying constitutional evidentiary principles, such as that enunciated in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). S.Rep.No.93–1277, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News, pp. 7051, 7068. Nonetheless, the Advisory Committee Notes to Rule 804(b)(3) recognize the problems of reliability and trustworthiness presented by such statements.

"Whether a statement is in fact against interest must be determined from the circumstances of each case. Thus a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest. . . . On the other hand, the same words spoken under different circumstances, e. g., to an acquaintance, would have no difficulty in qualifying. The rule does not purport to deal with questions of the right of confrontation."
See also, 4 Weinstein's Evidence Par. 804(b)(3)[03], pp. 104–113 (Bender, 1979 ed.) ("Because of the dangers involved, exclusion would almost always result when a statement against penal interest is offered against an accused.").

"It cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him. And probably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case. See, e. g., 5 Wigmore, Evidence § 1367 (3d ed. 1940). The fact that this right appears in the Sixth Amendment of our Bill of Rights reflects the belief of the Framers of those liberties and safeguards that confrontation was a fundamental right essential to a fair trial in a criminal prosecution. Moreover, the decisions of this Court and other courts throughout the years have constantly emphasized the necessity for cross-examination as a protection for defendants in criminal cases. . . . There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." (Footnote omitted) *Pointer v. Texas,* 380 U.S. 400, 404–05, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

See also *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 549–50, 13 L.Ed.2d 424 (1965); *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948). The cross-examination requirement functions to assure that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement." *California v. Green,* 399 U.S. 149, 161, 90 S.Ct. 1930, 1931, 26 L.Ed.2d 489 (1970).

In rare instances the Supreme Court has held that the admission without cross-examination of hearsay statements of a nontestifying declarant did not violate the accused's Sixth Amendment right of confrontation. See, e. g., *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (upholding admission of testimony regarding remark by accomplice about the defendant); *Mattox v. United States,* 146 U.S. 140, 151, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892) (dying declaration); *Mattox v. United States,* 156 U.S. 237, 240–44, 15 S.Ct. 337, 338–40, 39 L.Ed. 409 (1895) (admitting testimony of witness at earlier trial who had died). In each such instance, however, the circumstances were unusual and there was an abundance of evidence of the statement's reliability. In *Dutton,* for instance, the Court noted that the hearsay was not "crucial" or "devastating," it did not involve the use of a confession made "in the coercive atmosphere of official interrogation" or the use of a paper transcript, nor did it involve a "wholesale denial of cross examination." 400 U.S. at 87, 89, 91 S.Ct. at 219. See, in accord, *United States v. Puco,* 476 F.2d 1099, 1103 (2d Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973), permitting an exception to the right of cross-examination where "the statement is clearly trustworthy and is not 'crucial' to the prosecution or 'devastating' to the defendant."

Oliver's post-conspiracy statement clearly does not meet these standards for the narrow exception to the confrontation requirement. It represented the only direct positive identification of Cooper as a participant in the robbery. It was extremely incriminatory, detailing Cooper's planning and execution of the crime. It was both "crucial" and "devastating." It was error to admit it unless and until Oliver could be subjected to the crucible of cross-examination with respect to its contents. The situation here is very similar to that before the Court in *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), where a co-defendant's statement incriminating the defendant was made known to the jury by the prosecutor's reading from it upon his examination of the co-defendant, who declined to affirm the statement as his, invoking the Fifth Amendment. The admission of this "crucial link in the proof both of petitioner's act and of the requisite intent," *id.* at 419, 85 S.Ct. at 1077, without an opportunity to cross-examine the declarant,

was held to violate the defendant's right to confront his accuser. Cooper's conviction must therefore be reversed because of the erroneous admission against him of Oliver's statement, which violated Cooper's confrontation rights.

██ For the guidance of the district court upon remand we also consider Cooper's claim that the court erred in admitting, upon the Government's examination of the witness Denise Cook, a "mug shot" type of photo of him which she had earlier identified by writing on the back of the photo "I think this is the man who jumped the counter." The exhibit consisted of two black and white photographs of Cooper's head and neck, along side of each other, one representing a frontal view and the other a profile. There were no identification numbers or other incriminating evidence on the front or back of the exhibit other than the writing of the witness Cook identifying Cooper. Although Cooper objected to introduction of the photo he did not do so on the ground that as a "mug shot" it might incriminate him in the eyes of the jury. See Fed.R.Evid. 103(a)(1).

In *United States v. Harrington*, 490 F.2d 487, 494–95 (2d Cir. 1973), we established a tripartite test for determining whether the introduction of a "mug-shot" type photograph may have such a prejudicial effect as to render its admission reversible error:

"1. The Government must have a demonstrable need to introduce the photographs; and

2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and

3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs."

Applying this three-pronged standard to the present case, it is clear that the Government had a demonstrable need to introduce the photo shots of Cooper. Denise Cook, the note teller at the Liberty National Bank who witnessed the robbery, testified that she was unsure whether anyone in the courtroom was one of the robbers. However, she had earlier selected from a spread the photograph of Cooper as a person she thought was "the man who jumped the counter" during the robbery. In view of the lack of any direct positive identification of Cooper by any other witness, her selection of Cooper's photo from the spread was both relevant and essential to the Government's case. See *United States v. Fosher*, 568 F.2d 207, 213–14 (1st Cir. 1978); *United States v. Watts*, 532 F.2d 1215, 1217 (8th Cir.), *cert. denied*, 429 U.S. 847, 97 S.Ct. 131, 50 L.Ed.2d 119 (1976); *United States v. Scott*, 494 F.2d 298, 301 (7th Cir. 1974); *Barnes v. United States*, 365 F.2d 509, 512 (D.C.Cir.1966). Aside from Oliver, who refused to testify at trial, the Government had no other identifying witness so that the photo selection represented an important piece of proof.

Turning to the second prong, the photo introduced here, while showing a front and side view of the defendant Cooper, does not imply that he had a prior criminal record. It bore no prison identification numbers or other incriminating data. Unlike the photos introduced in *Harrington, Barnes v. United States, supra; United States v. Harman*, 349 F.2d 316 (4th Cir. 1965), and some other cases relied on by Cooper, it was neither an unaltered police shot nor one that had been masked in such a clumsy fashion as to draw the jury's attention to its incriminating nature but one that could well have had no relation to any prior criminal charge. Indeed, as far as the jury was concerned, the photo could well have been taken upon Cooper's arrest in the present case. See *Anthony v. United States*, 433 F.2d 952 (9th Cir. 1970). The jury was aware that Oliver had given his statement on August 8, 1979, and that the FBI agent (Bellitto) had interviewed Cooper on August 9, 1979, which was followed on August 10, 1979, by Ms. Cook's photo identification of Cooper. Moreover, as we noted in *Harrington*, 490 F.2d at 495, the mere fact that a photo might look to some like a "mug shot" does not automatically imply the existence of a prior criminal record as long as prejudicial data is carefully removed. Here

that was done by reproducing the photo with all incriminating data completely obliterated.

Lastly, the manner of introduction of the photo did not draw attention to any possible incriminatory implications. It was never referred to as a "mug shot" or as a photo taken on a prior arrest. See, e. g., *United States v. Reed*, 376 F.2d 226 (7th Cir. 1967). There was no debate in the presence of the jury regarding its introduction, such as occurred in *Harrington* and *Barnes*. In short, the possibility of prejudice from the admission of the photo was minimal and clearly outweighed by its probative value on the issue of identification.

We find no merit in the other points raised by Cooper. Judge Elfvin acted well within his discretion in ruling that, if Cooper took the stand, his prior convictions, one for burglary in the second degree and two for robbery in the third degree, all within 10 years of the present arrest, would be admitted to impeach Cooper's credibility. See Fed.R.Evid. 609; *United States v. DeAngelis*, 490 F.2d 1004, 1009 (2d Cir.), *cert. denied*, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974); *United States v. Reed*, 572 F.2d 412, 426 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978).

The conviction of Oliver is affirmed. The conviction of Cooper is reversed and his case remanded for a new trial.