UNITED STATES of America

v.

John GAMBINO, et al., Defendants.

No. 9S 88 Cr. 919 (PKL).

United States District Court,
S.D. New York.

July 13, 1993.

Mary Jo White, U.S. Atty., S.D.N.Y., New York City (James B. Comey, Patrick J. Fitzgerald, of counsel), for U.S.

Ruth M. Liebesman, New York, Santangelo, Santangelo & Cohen, New York City (George L. Santangelo, of counsel), for John Gambino.

Edward S. Panzer, Bruce Cutler, New York City, for Joseph Gambino.

Charles F. Carnesi, Brooklyn, NY, for Lorenzo Mannino.

Howard R. Leader, New York City, for Matteo Romano.

## OPINION AND ORDER

LEISURE, District Judge.

Defendant John Gambino has brought a motion requesting that the Court declare him incompetent to stand trial due to his mental and physical health. For the reasons stated below, the motion is denied.

## BACKGROUND

Defendant John Gambino was arrested on January 4, 1990 and charged in the seventh superseding indictment herein with narcotics and racketeering activities. In May 1990, John Gambino moved the Court, pursuant to the Sixth Amendment and Rule 14 of the Federal Rules of Criminal Procedure, for a

severance based upon his medical disabilities. Most of Mr. Gambino's medical problems are traceable to rheumatic heart disease which resulted in a stroke in August 1985 and successful heart surgery in March 1987. In connection with this application, John Gambino submitted several documents including, *inter alia*, the medical reports of his cardiologist, Dr. Simon Dack, and his psychiatrist, Dr. Daniel W. Schwartz. Over the next several months, the Government was furnished with John Gambino's medical records by defense counsel. In addition, the Government then had its own physician, Dr. Francis M. Weld, and neurologist, Dr. Sidney M. Cohen, examine John Gambino. However, no formal opposition papers were submitted by the Government at that time.

In May 1992, after a substantial pretrial delay due to the appeal of a double jeopardy issue to the United States Supreme Court as well as the need for defense counsel to prepare adequately for the lengthy trial, the Court set a trial date of January 11, 1993. In early September 1992, John Gambino fled the jurisdiction and was apprehended on September 20, 1992 by law enforcement officials in Fort Lauderdale, Florida. On September 28, 1992, a grand jury filed the ninth superseding indictment which, *inter alia*, added a bail jumping count against defendants John Gambino and Joseph Gambino.

On October 23, 1992, John Gambino renewed his medical severance motion based upon the medical evidence previously gathered by defense counsel in 1990. The Government, in opposing the application, submitted the reports of Dr. Weld and Dr. Cohen from 1990 stating, respectively, that John Gambino was physically and mentally competent to stand trial.

On December 21, 1992, the Court issued an Opinion and Order denying the motion for medical severance. The Court considered the five factors set forth in *United States v. Doran*, 328 F.Supp. 1261, 1263 (S.D.N.Y. 1971) (Frankel, J.) and its progeny—the medical evidence, the defendant's activities

outside the courthouse, the possibility of precautionary measures, the usefulness of a continuance or severance, and the magnitude and seriousness of the charges. Weighing these various factors, the Court found that a medical severance for John Gambino in the instant case was unwarranted and, under the circumstances, a hearing on this issue was not required.

The Court also directed the Government to conduct a mental and physical examination of John Gambino to update his condition and to assist the Court in determining what precautionary measures, *if any*, the Court should take during the course of the trial with respect to John Gambino's health. On December 23, 1992, an examination was conducted by a cardiologist, Dr. Ira Cliff Schulman. Dr. Schulman found Mr. Gambino's health to be unchanged since his last examination in November 1992 and concluded that he appeared stable enough from a cardiac standpoint to commence with his trial. Dr. Schulman also suggested that John Gambino should take a small dosage of beta-blocker which, in addition to his current medical regimen, would help maintain a stable cardiac status during the trial. *See* Report of Dr. Ira Cliff Schulman, dated December 23, 1992.

On December 28, 1992, John Gambino was examined by a neurologist, Dr. Mitchell S. Raps, who described Mr. Gambino as being alert and oriented. Dr. Raps noted that there was no impairment of John Gambino's communicative skills (i.e. aphasia), but also indicated that there appeared to be some difficulty with memory.[1] *See* Report of Dr. Mitchell S. Raps, dated December 28, 1992. On January 5, 1993, John Gambino received a CAT scan. Subsequent to the completion of the series of physical and mental tests, no specific precautionary measures (other than the possible use of additional medication for his heart) were recommended to the Court.

On January 6, 1993, five days before jury selection was scheduled to begin, John Gambino made a renewed motion for a psychiatric examination, an examination by his own car-

---

1. On January 8, 1993, a Government psychiatrist, Dr. Brian J. Ladds, also examined John Gambino. Dr. Ladds revealed no new medical problems and had no specific recommendations

to the Court with respect to measures which should be taken during the trial. *See* Report of Dr. Brian J. Ladds, M.D., dated January 8, 1993.

diologist and for a hearing as to his mental and physical ability to stand trial. This motion was brought by John Gambino's trial counsel, George Santangelo, Esq., along with Ruth M. Liebesman, Esq., who had been retained as "medical counsel" to handle the legal issues relating to John Gambino's health.[2] The motion primarily relied upon the evidence and arguments rejected by the Court in the medical severance motion, but also argued that more recent developments supported this renewed motion. More specifically, counsel argued that John Gambino had been experiencing dizziness and light-headedness in the early days of January. In addition, counsel noted that John Gambino was allergic to the beta-blocker suggested by Dr. Schulman in his most recent report.[3] *See* Memorandum of Law in Support of Defendant John Gambino's Renewed Motion, dated January 6, 1993 ("John Gambino's Memorandum of Law"), at 4–6.

While the Government objected to the reopening of the competency issue, the Government did not object to allowing John Gambino's doctors to again examine Mr. Gambino as long as such examinations (1) focused on precautionary measures which may be taken at trial with respect to Mr. Gambino's health, (2) did not delay the trial, and (3) were conducted in a manner and location which would alleviate the security concerns of the Metropolitan Correctional Center ("MCC") where John Gambino was being held. *See*

Government's Letter to the Court, dated January 7, 1993.

The psychiatric and psychological examinations were conducted by Mr. Gambino's doctors on January 12 and 21, 1993 and February 1, 1993. In addition, Mr. Gambino was examined by his own cardiologist, Dr. Dennis S. Reison, on February 12, 1993. On March 17, 1993, the report of John Gambino's psychiatrist, Dr. Robert Lloyd Goldstein, was submitted to the Court. Mr. Gambino's medical counsel, Ruth Liebesman, Esq., also contacted the Court at that time and requested a hearing date.[4]

On April 6, 1993, the Court conducted the competency hearing. At the conclusion of the hearing, the Government and medical counsel for John Gambino agreed to set a briefing schedule in which each side could summarize the evidence and present their respective arguments to the Court. The Court received written submissions from both sides and, upon receipt of John Gambino's reply papers on May 6, 1993, the renewed motion with respect to Mr. Gambino's competency to stand trial became fully submitted before the Court.

On June 4, 1993, the jury returned a verdict of guilty on the bail jumping count as to John Gambino and Joseph Gambino, but was unable to reach a verdict on the remaining counts. The Court has set November 1, 1993 as the date for the new trial on the remaining counts.

---

2. The Court notes that matters relating to John Gambino's medical issues and claims of incompetency (including the competency hearing itself) were handled almost exclusively by Ms. Liebesman, rather than by Mr. Santangelo who acted as trial counsel.

3. On the issue of the proposed new medication, the Government immediately contacted Dr. Schulman to address the concerns of John Gambino's counsel. Assistant United States Attorney James B. Comey, Esq., summarized his conversation with Dr. Schulman to the Court as follows:

> With respect to Mr. Gambino's most recent cardiology examination, I spoke last night with Dr. Ira Cliff Schulman, the cardiologist who examined him in December and submitted a report to the Court. I informed Dr. Schulman that defense counsel were making much of his suggestion that a beta-blocker might be a valuable addition to Gambino's medical regimen. Dr. Schulman said that, as an initial matter, if

> Gambino is worried about the effect of a beta-blocker, he can simply not take the medication as it is not absolutely necessary; he only suggested it [sic] a precaution. Most importantly, however, Dr. Schulman said the concerns about the beta-blocker he suggested are misplaced. Dr. Schulman has prescribed such beta-blockers for approximately 2500 patients and can recall only two who had any problems with the drug. He added that the risk of an allergic reaction was greatly reduced given the nature of the beta-blocker he prescribed, which does not enter the brain in the same manner as does the class of drugs to which Gambino asserts he is allergic.

Government's Letter to the Court, dated January 7, 1993, at 1–2.

4. On March 18, 1993, the Court set April 6, 1993 as the date for the competency hearing.

## DISCUSSION

While John Gambino's original pre-trial motion for a medical severance focused primarily upon his heart problems, this renewed competency motion has switched its focus to mental problems including Mr. Gambino's purported inability to follow the proceedings, assist his trial counsel, and testify effectively in his own defense. With respect to this latest competency motion, the heart ailment was raised in relation to the effect such an ailment may have on his ability to testify in his own behalf at trial. For example, at the hearing, Mr. Gambino's psychiatrist testified about the cardiac risks associated with testifying at trial. *See* Transcript of April 6, 1993 Hearing ("Hearing Transcript"), at 50–51. Therefore, in deciding the issue of mental competency, the Court also will address Mr. Gambino's physical problems to the extent that such problems may impact on his mental competence and general ability to stand trial.

## I. THE LEGAL STANDARD

Pursuant to 18 U.S.C. § 4241(d), the Court must declare John Gambino incompetent to stand trial if, after a hearing on the matter, "the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). The Second Circuit has noted "[t]he test of competency under this section is 'whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" *United States v. Hemsi*, 901 F.2d 293, 295 (2d Cir. 1990) (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (per curiam)); *see also United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir.1986), *cert. denied*, 479 U.S. 1036, 107 S.Ct. 888, 93 L.Ed.2d 841 (1987); *United States v. Oliver*, 626 F.2d 254, 258 (2d Cir. 1980); *Newfield v. United States*, 565 F.2d 203, 206 (2d Cir.1977).

In *United States v. Hemsi, supra*, the Second Circuit stated that "[t]he inquiry involves an assessment of whether the accused can assist 'in such ways as providing accounts of the facts, names of witnesses, etc.'" 901 F.2d at 295 (quoting *United States v. Mercado*, 469 F.2d 1148, 1152 (2d Cir.1972)). However, the Court also noted that "it is not sufficient merely that the defendant can make a recitation of the charges or the names of witnesses, for proper assistance in the defense requires an understanding that is 'rational as well as factual.'" *Hemsi*, 901 F.2d at 295 (quoting *Dusky v. United States*, 362 U.S. at 402, 80 S.Ct. at 789).

In assessing the competence of a defendant, the Court can take into account a number of factors, including the medical evidence and the Court's observations of the defendant's demeanor during the course of the trial. As discussed in detail below, the Court has considered the various factors and finds that John Gambino was clearly competent to stand trial.

## II. MEDICAL EVIDENCE

The Court has been presented with substantial medical evidence regarding the issue of John Gambino's mental competence to stand trial. The Court was first presented with such evidence in connection with the medical severance motion made by John Gambino in May 1990 in which John Gambino requested that he be granted a continuance and be tried separately from his codefendants because of his medical disabilities. The Government's neurologist, Dr. Sidney M. Cohen, concluded in November 1990, after examining John Gambino and reviewing his medical history, that John Gambino was competent to stand trial and did not need to be severed from the case:

Based on the history, medical records and my neurology and mental status examinations, I conclude that he is competent to stand trial from a neurological standpoint. He has sufficient present ability to consult with counsel with a reasonable degree of rational understanding and he has a rational and factual understanding of the proceedings against him. He knows the nature and quality of the acts of which he is

accused and the ability to choose right from wrong. The medications that he is on do not significantly alter his attention, concentration and mental capacities. He is able to confer with his attorney in his defense. His communications and comprehension are adequate for participation in court proceedings. He shows only slight inconstant forgetfulness. He can solve everyday problems well with good judgment in relation to past performance.... Based on these considerations, there is no significant evidence of dementia. Therefore, in my judgment, a separate trial is not necessary as long as he can confer with his lawyer regarding review of court data and implications of questions and events in court. His functional capacity is adequate.

Report of Sidney M. Cohen, M.D., dated November 30, 1990, at 13 (Annexed as Exhibit C to the Affirmation of AUSA James B. Comey, Esq., dated November 10, 1992 ("Comey Affidavit")).

Significantly, John Gambino's own psychiatrist, Dr. Daniel W. Schwartz, while disagreeing with the Government's neurologist on the question of severance, also concluded that John Gambino was fit to stand trial. Dr. Schwartz recognized that John Gambino suffered from organic mental disorder, as a result of the stroke, which produced "low frustration tolerance, significantly impaired ability to pay attention, concentrate and recall, and easy fatiguability" as well as anxiety and depression. *See* Report of Daniel W. Schwartz, M.D., dated May 8, 1990, at 3 (Annexed as Exhibit H to the Affidavit of John L. Pollok, Esq., sworn to on May 10, 1990). However, Dr. Schwartz also reached the following conclusions about John Gambino's competency to stand trial:

> On examination Mr. Gambino is fully alert, quite cooperative and reasonably well oriented. There is no cognitive impairment. He understands the purpose of a trial and the functions of the principals in a trial. He correctly names his lawyers and tentatively indicates that he trusts them ("They got a good reputation"). *There is no indication that he could not choose rationally among the several defense alternatives, or even sustain the stress of trial.*

Schwartz Report, at 2 (emphasis added); *see also id.* at 2 ("Mr. Gambino correctly states that he is charged with 'conspiracy' involving 'drugs' and on further questioning readily acknowledges also being charged with RICO. He emphatically insists that he is factually innocent. He apparently has no independent recollection of the specific charges. When they are read to him, he understands and appreciates all those that name him, and responds appropriately with either bitterness or astonishment.") Although recommending a separate trial to allow Mr. Gambino to proceed at a slower pace, Dr. Schwartz did conclude that John Gambino was "fit to proceed" from a psychiatric standpoint. *Id.* at 3.

Accordingly, as of 1990, the medical experts for both John Gambino and the Government had concluded that John Gambino was mentally fit to stand trial. No new medical evidence was offered by John Gambino at the time of his renewed motion for medical severance in October 1992. In December 1992, the Court, based upon the medical evidence and various other factors, denied the severance motion. *See United States v. Gambino*, 809 F.Supp. 1061, 1076–79 (S.D.N.Y.1992).

As a result of tests conducted on John Gambino during the first few months of 1993, while the trial was in progress, counsel for John Gambino presented "new evidence", in the form of written reports and the testimony of Dr. Sanford L. Drob and Dr. Robert Lloyd Goldstein, suggesting that Mr. Gambino is unfit to stand trial because of his medical condition. At the competency hearing, Dr. Drob, a clinical psychologist, indicated that he had conducted several psychological tests on John Gambino during the course of two sessions in January and February 1993 and found that he had performed poorly on these tests. Dr. Drob classified him in the "mentally deficient range" in virtually all areas. Hearing Transcript, at 36. With respect to his ability to stand trial, Dr. Drob concluded as follows:

> In order to make that assessment ... you have to consider the functions that this man needs to perform in order to assist his attorney, and in view of the complicated

nature and the lengthy nature of the trial, in view of the fact that there is a great deal of information to assimilate and deal with, I think he would, based upon my testing, I think he would be of very little help to his attorney in dealing with these charges at all. I would imagine that he would not be able to assist in any meaningful or productive way.

Hearing Transcript, at 35. Dr. Drob also concluded that Mr. Gambino was highly suggestible and, given his cognitive abilities, would have a difficult time on the stand. *Id.* at 35–36. Dr. Goldstein testified at the competency hearing that he had reached a similar conclusion:

> [G]iven the very severe and significant nature of his deficits, his cognitive deficits as I've described them, I don't believe he's competent to assist counsel in ... what seems to be a complex and lengthy criminal proceeding in the sense that he'd be unable to retain what he observed, he'd be unable to keep track of what's going on, he'd forget things, he'd report inaccurately, and in general I think he'd be unable to give reliable assistance.

Hearing Transcript, at 52.

The Court questions the reliability of these new medical conclusions. First, at best, Dr. Drob concluded that John Gambino's performance had declined slightly in several psychological testing categories since 1990 when the last defense expert, Dr. Schwartz, submitted a report to the Court concluding that Mr. Gambino was fit to proceed.[5] Neither Dr. Drob nor Dr. Goldstein provided a satisfactory explanation as to why the prior defense psychiatrist in 1990, *based upon nearly identical psychological data,* concluded that Gambino was fit to stand trial. Moreover, Dr. Drob and Dr. Goldstein failed to explain why the Court could no longer reasonably rely on the Government neurologist's finding in late 1990 that John Gambino was fit to

stand trial. Under such circumstances, the conclusions of the former defense expert, as well as the Government neurologist, undermine the conclusions of both Dr. Drob and Dr. Goldstein.

Second, the Court notes that, while Doctors Drob and Goldstein concluded that John Gambino was unable to comprehend the nature of the proceedings and to assist his counsel, neither doctor discussed any of these matters with John Gambino's trial counsel, George Santangelo, Esq., nor had they observed any portion of the trial before making such an assessment. *See* Hearing Transcript, at 38–39, 53–54. At the time that these doctors' testified at the competency hearing on April 6, 1993, John Gambino had already been on trial for almost three months with Mr. Santangelo representing him as trial counsel. It would seem that, under such circumstances, that Mr. Santangelo's experiences regarding his ability to interact with Mr. Gambino would provide important information to those doctors with respect to John Gambino's understanding of the proceedings and ability to assist him in conducting the defense. The doctors' failure to consult Mr. Santangelo, or to even observe Mr. Gambino during the trial, before making their assessments is one factor the Court must consider in deciding the weight that the Court should give to their conclusions regarding how Gambino's "mental deficiencies" affect his performance during the trial. In fact, as noted in more detail below, the affidavit submitted by Mr. Santangelo, subsequent to the competency hearing, regarding Mr. Gambino's understanding of the proceedings and ability to assist in his own defense, to some extent, undermines the conclusions of Doctors Drob and Goldstein on these issues. In addition, as discussed in more detail below, the Court believes that, if the doctors had observed any portion of the trial, they would have observed John Gambino functioning extremely well in

---

**5.** At the hearing, Dr. Drob acknowledged that Mr. Gambino was given many of the same psychological tests by Gambino's neuropsychologist in 1990 and the findings were "somewhat similar" with the only significant decline being in the test which measures arithmetic skills. *See* Hearing Transcript, at 18. Moreover, on cross-examination, Dr. Drob conceded that, while there may

have been further deterioration of his brain since the stroke in 1985, "it seems as if he had many of these deficits beginning in '85 and he's had them for all that time." *See* Hearing Transcript, at 38. Therefore, the underlying medical data in the most recent tests does not appear to be significantly different from the data that the former defense psychiatrist compiled in 1990.

terms of his ability to understand the testimony and to assist his trial counsel.

In sum, the Court finds the Government neurologist's conclusion in late 1990, that John Gambino was competent to stand trial, to be credible and reliable to this date. The Court does not believe that the medical data presented by the new defense experts, in any way, places into question the continued reliability of that finding. Instead, the "new data" presented to the Court is not significantly different from the 1990 data which provided the basis for the former defense expert's conclusion that John Gambino was competent to stand trial. The Court is aware of no medical data which suggests that Mr. Gambino's medical health has deteriorated to such an extent since the time of the Government's comprehensive examination in 1990 so as to render him incompetent.

## III. CONDUCT DURING THE TRIAL

Since the trial has already taken place, the Court is not in a position where it must review conflicting medical evidence in a vacuum. Instead, the Court is fortunately able to weigh the medical evidence in conjunction with the Court's own extended observations of the defendant's demeanor and his interaction with trial counsel during the almost five months of trial (including jury selection).

It is well settled that "[i]n making its assessment [regarding competency], the court may take account of a number of factors, including the defendant's comportment in the courtroom." *United States v. Hemsi,*

901 F.2d 293, 295 (2d Cir.1990); *see also Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975); *United States v. Oliver,* 626 F.2d 254, 258–59 (2d Cir.1980); *United States v. Sullivan,* 406 F.2d 180, 185 (2d Cir.1969). The Court, during the course of the five-month trial, observed John Gambino conduct himself in a manner that strongly suggests that he understood the proceedings and was able to assist counsel in the defense of the case. Mr. Gambino clearly was paying attention during the trial testimony and his appropriate reactions to the testimony and his repeated colloquies with his counsel during cross-examination of witnesses provides strong evidence that he understood the witnesses' testimony and was able to provide meaningful assistance to his counsel in cross-examining such witnesses. At no point during the trial did the Court observe *any* behavior by John Gambino which would provide a basis for questioning his competence.[6]

The Court also notes that Mr. Santangelo's affidavit, to some extent, substantiates the Court's observations. With respect to Mr. Gambino's ability to understand the proceedings and assist in the preparation of his defense, Mr. Santangelo stated that: (1) "Mr. Gambino seems to understand what is being said by witnesses at the time that they are testifying. Later, however, his recall is shaky and he has difficulty integrating ongoing testimony with that previously given."; (2) "Mr. Gambino tires very quickly" and "cannot read for long periods of time because his concentration seems to diminish quickly";

---

**6.** In addition to observing John Gambino during the course of the trial, the Court also had the opportunity to observe Mr. Gambino's demeanor during the pretrial conferences and hearings. During such conferences, Mr. Gambino always conducted himself in manner that clearly indicated to the Court that he understood the substance of the conference and was able to communicate in a substantive way with his attorney. *See United States v. Oliver,* 626 F.2d at 259 ("[Defendant's] intelligent responses to questions put to him by the court provide further evidence of his competency."). A good illustration is the *[United States v.] Curcio* [680 F.2d 881] [(2d Cir.1982)] hearing conducted on December 15, 1992 in connection with counsel for co-defendants Joseph Gambino and Lorenzo Mannino. *See* Transcript of December 15, 1992 Hearing, at 10–49. As part of this hearing, the other defendants were

asked whether they would waive their right to call Mr. Mannino's proposed trial counsel, Charles Carnesi, Esq., as a witness during the trial in connection with his representation of former defendant John Zarbano, who had pled guilty to certain charges. The Court engaged in a brief colloquy with John Gambino during which Mr. Gambino indicated that he had fully discussed the matter with his lawyer, understood his lawyer's explanation, and did not wish to call Mr. Carnesi and, thus, would waive his right to do so. *See* Transcript of December 15, 1992 Hearing, at 41–43. Based upon Mr. Gambino's answers to the questions, his lawyer's representations, and the Court's observation of Mr. Gambino, the Court was confident that Mr. Gambino was competent to waive that right and concluded that the waiver was knowing and voluntary.

(3) "Mr. Gambino makes a concerted effort to assist in his own defense. He attempts to review 3500 material in order to aid me. When he does so, however, he strains himself and often is too exhausted to be of any assistance to me during the trial. He always, however, attempts to put his best foot forward and will not complain unless the situation is extreme." Affidavit of George L. Santangelo, Esq., sworn to on April 22, 1993 ("Santangelo Affidavit"), at ¶¶ 4–6.

Thus, Mr. Santangelo acknowledged that John Gambino seemed to understand the testimony of witnesses and was making a "concerted effort" to be an active participant in his own defense by, *inter alia*, attempting to review material provided by the Government pursuant to 18 U.S.C. § 3500 ("3500 material"). Mr. Santangelo's concerns related to Mr. Gambino's difficulty integrating on-going testimony, his inability to concentrate for long periods of time, and his stamina problem. The Court finds that these problems, which seem to be generated by Mr. Gambino's medical condition, simply do not rise to the level of mental incompetence in the instant case. Moreover, these types of problems were alleviated, in substantial part, through the use of precautionary measures during the trial.

The Court took several precautionary steps with respect to the trial proceedings to minimize any concentration or fatigue problems which John Gambino might experience during the course of the trial. Some of these steps were initiated by the Court and other measures were taken in response to requests by defense counsel. First, the Court only conducted trial proceedings on Monday through Thursday and, thus, John Gambino had three full days each week to rest, review trial material, and communicate with his attorney. Second, on each trial day, the Court took a mid-morning and mid-afternoon break in addition to a 90–minute lunch recess which minimized any fatigue or concentration problems which John Gambino might experience. Moreover, the Court communicated with the United States Marshals in charge of the trial to emphasize that the lawyers should have the opportunity to speak with the defendants during these court recesses, including the lunch break.

The Court also accommodated reasonable requests concerning Mr. Gambino's conditions of confinement which would alleviate potential fatigue and concentration problems. For example, at the start of the trial, trial counsel for John Gambino informed the Court that it is the practice of the Metropolitan Correctional Center to awake the prisoners, who are on trial, *at a very early hour* and, after appropriate security checks, take such prisoners to the holding pen in the courthouse and have the defendants wait in the holding pen until the start of the court proceedings on that day. Counsel for John Gambino indicated to the Court his concern that Mr. Gambino get proper sleep on trial days and requested that the Court speak with officials at the MCC to inquire as to whether special arrangements could be made for John Gambino to be brought over to the courthouse as late as possible in light of his medical condition. The Court communicated with MCC officials and indicated defense counsel's concerns. In response to the Court's request, the MCC stated that it would make special arrangements so that Mr. Gambino would be allowed to sleep later than the rest of the prisoners and, instead of being transported to the courthouse with the group of prisoners at the normal time, MCC officials would bring Mr. Gambino over separately at the latest possible time which would still allow him to be present in the courtroom at 9:30 a.m. each morning. Thus, the amount of time spent by John Gambino in the holding pen was minimized.[7]

During the course of the trial, counsel for John Gambino also made another request concerning a modification of Mr. Gambino's confinement at the MCC which he believed would help facilitate Mr. Gambino's review of relevant 3500 material relating to the testimony of key Government witnesses. On the morning of March 29, 1993, John Gambino reported that he had been feeling sick and

---

7. At counsel's request, John Gambino also was provided with a special hot lunch on trial days to help his stamina.

dizzy. Mr. Santangelo requested a one-day continuance and stated that he believed it was a "temporary thing." Trial Transcript, at 3568. The Court immediately had John Gambino examined by an MCC doctor who stated that he did not detect anything wrong with Mr. Gambino, but indicated that a blood test would be conducted in an excess of caution. The Court adjourned the trial for the remainder of the day and stated that, unless the MCC doctor advised otherwise or the blood test indicated reasons for concern, the trial would resume the following day.[8] *Id.* at 3578.

On that same morning, Mr. Santangelo requested that John Gambino be placed in the same unit in the MCC as his brother, co-defendant Joseph Gambino, where there were less distractions and John Gambino would be able to review the trial material (including 3500 material) with his brother so as to avoid duplication of effort. Trial Transcript, at 3569–71. Mr. Santangelo stated that, to that date, John Gambino had been able to review the material on his own, but that, given the voluminous 3500 material connected with an upcoming key Government witness, Salvatore Gravano, it was his belief that it would assist John Gambino to review this material with his brother. *Id.* at 3569–70. Mr. Santangelo indicated that he had met with his client the previous Friday and Saturday at the MCC and he knew that Mr. Gambino spent the entire previous day, Sunday, March 28, 1993, reviewing 3500 material.[9] *Id.* at 3570–71. Mr. Santangelo speculated that John Gambino's dizziness may have been caused by his review of the material and suggested that making these arrangements, to which the Government had no objection, might avoid a repetition of this problem and, as a general matter, would avoid Mr. Gambino becoming tired during the afternoon session because he had been reviewing 3500 material the night before.

*Id.* The Court met with officials of the MCC who agreed to place John and Joseph Gambino in the same unit for the duration of the trial.[10] The Court notes that, prior to this request which took place about two months into the trial, Mr. Santangelo did not give any indication to the Court that any problems existed during the trial with respect to Mr. Gambino's ability to understand the trial testimony and participate effectively in his own defense.

The Court emphasizes that the numerous steps outlined above were *not* installed as part of any formal finding by the Court that these measures were *required* because of John Gambino's mental competence; rather, such steps were simply taken as precautionary measures by the Court. Out of an abundance of caution, the Court took these unusual steps to ensure that Mr. Gambino would have every opportunity to participate actively in the defense of his case and, thus, the Court would avoid any potential concerns of defense counsel relating to John Gambino's fatigue or inability to concentrate. As noted earlier, it is the Court's finding, based upon its own observation, that John Gambino understood the testimony and evidence being offered against him and was able to communicate in a meaningful way with his counsel during the entire length of the trial. His response to the events in the courtroom and communications with his attorney at appropriate times gave the unequivocal impression to the Court that he was paying attention to the testimony, understood the impact of the testimony, and was able to assist his counsel in challenging such evidence.

## IV. ABILITY TO TAKE THE STAND

In addition to the general arguments with respect to John Gambino's alleged inability to understand the proceedings against him and to assist trial counsel in preparing a

8. The Court notes that the blood test results revealed no problems. John Gambino was able to proceed with the trial on the following day without any complaints of dizziness or sickness.

9. The Court notes that it was the Government's practice during the trial to provide 3500 material to defense counsel well in advance of the witness's appearance so that defense counsel would

have adequate time to review the material and prepare for cross-examination without needing a continuance.

10. The Court would like to commend both the MCC and the United States Marshal's Office for their cooperation and extraordinary efforts during the course of this lengthy trial.

defense, it also is argued, more specifically, that Mr. Gambino was mentally and physically unable to take the stand in his own defense. *See* John Gambino's Memorandum of Law, at 10–13. First, relying upon the medical evidence presented by Mr. Gambino's psychiatrist and psychologist and Mr. Santangelo's statements setting forth his concerns about Mr. Gambino's ability to take the stand, it is argued that Mr. Gambino was *mentally* unfit to testify at trial. *Id.* at 10–11. Second, relying upon medical evidence, it is further argued by Dr. Goldstein, a psychiatrist, that Mr. Gambino also was *physically* unable to exercise this fundamental right because there would be a substantial risk of a heart attack or stroke if he were to testify in his own behalf. *Id.* at 11–13.

The Court notes that, in assessing a defendant's competency, the Court must determine the impact, if any, that his mental or physical condition will have on his ability to participate in his own defense, including the exercise of his fundamental rights such as the right to testify in his own behalf, the right to confront adverse witnesses and the right to be present. *See United States v. Brown*, 821 F.2d 986, 988 (4th Cir.1987). Therefore, the Court must consider the defendant's ability to take the stand in the overall context of determining whether the defendant is able to participate meaningfully in his own defense.[11]

### (1) Mental Ability to Take the Stand

The Court rejects John Gambino's contention that he was mentally incompetent to take the stand. As noted earlier, the medical information submitted in 1990 by the Government doctor and John Gambino's doctor provide strong evidence that John Gambino was competent to stand trial and possessed the mental capabilities necessary to take the stand if he chose to do so. In finding John Gambino competent to stand trial from a neurological standpoint, the Government neurologist stated that "[John Gambino's] communications and comprehension are adequate for participation in court proceedings. He shows only slight inconstant forgetfulness." Report of Sidney M. Cohen, M.D., dated November 30, 1990, at 13. Mr. Gambino's own psychiatrist, Dr. Schwartz, similarly found in 1990 that "Mr. Gambino is fully alert, quite cooperative and reasonably well oriented. There is no cognitive impairment. He understands the purpose of a trial and the functions of the principals in a trial." Report of Daniel W. Schwartz, M.D., dated May 8, 1990, at 2. Dr. Schwartz also noted that "[t]here is no indication that he could not choose rationally among the several defense alternatives, or even sustain the stress of trial." *Id.*

The Court finds the "evidence" to the contrary offered by John Gambino's latest ex-

---

**11.** While not conceding that John Gambino is incompetent to take the stand, the Government also argues that a defendant's inability to testify due to a mental disease or defect does not automatically render him incompetent to stand trial. In support of this position, the Government cites several cases where courts have held that defendants with amnesia may be competent to stand trial. *See, e.g., United States v. Villegas*, 899 F.2d 1324, 1341 (2d Cir.) ("A defendant's amnesia about events surrounding the crime will not automatically render him incompetent to stand trial."), *cert. denied*, 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990); *see also United States v. Rinchack*, 820 F.2d 1557, 1569 (11th Cir.1987); *United States v. Swanson*, 572 F.2d 523, 526–27 (5th Cir.), *cert. denied*, 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978). Based upon this case law, the Government argues that, in the instant case, "Gambino is fully able to assist counsel and is thus competent to stand trial regardless of whether his claimed condition precludes successful testimony in his own defense." *See* Government's Letter to the Court in Opposi-

tion to John Gambino's Motion, dated April 27, 1993, at 7.

The Court notes that competency determinations involving amnesiac defendants turn upon the peculiar factual circumstances of each case. *Villegas*, 899 F.2d at 1341. The Court must consider a variety of factors including "whether the defendant has any ability to participate in his defense, whether the amnesia is temporary or permanent, whether the crime and the defendant's whereabouts at the time of the crime can be reconstructed without his testimony, whether the government's files will be of assistance in preparing the defense, and whether the government's case is strong or weak." *Id.* While these factors could support finding John Gambino to be competent under the circumstances of the instant case even if his condition precluded him from effectively testifying in his own defense, the Court need not reach this issue because, as noted in detail below, the Court finds that Gambino was mentally and physically capable of taking the stand and testifying in a meaningful way to the jury.

perts to be unpersuasive. The new Gambino doctors concluded that a psychological condition, which they referred to as "suggestibility," would prevent Mr. Gambino from effectively testifying in his own defense. The doctors believed that, if Mr. Gambino took the stand, he would become easily confused, would take cues from the attorney asking the questions, and, thus, his responses would unintentionally be the product of the suggestive nature of the attorney's questions, rather than being reliable responses based upon his own independent recollection and cognitive process. *See* Hearing Transcript, at 35–36, 49–50.

The Court rejects the conclusions of Doctors Drob and Goldstein and, instead, finds that the evidence offered by the Government neurologist in November 1990 is more credible and remains valid. While the latest set of defense doctors have discussed this "suggestibility" theory and reached the conclusion that Mr. Gambino is unfit to take the stand, these doctors have failed to produce credible medical evidence which supports such a conclusion and also have failed to explain why these new conclusions, which are based on virtually the same data that existed in 1990, are contradicted by John Gambino's former psychiatrist.

The Court has not been presented with any new medical evidence which would cause the Court to question whether the extensive examination conducted by the Government neurologist in November 1990 is outdated and, thus, unreliable. In fact, the continued reliability and validity of the findings of the Government doctor in 1990 is confirmed by the Court's own observations of John Gambino during the course of the five-month trial. As discussed in detail earlier, John Gambino's comportment and behavior during the course of the trial (including brief colloquys between Mr. Gambino and the Court relating to certain waiver issues) provides strong evidence that he had a clear understanding of the court proceedings and the content of the testimony being offered and, if he wished, would have been able to communicate his thoughts and recollection of relevant events in a meaningful way to the jury if he took the stand in his own defense.

Moreover, the Court's weighing of the conflicting medical evidence, as well as its own independent observation of Mr. Gambino, are not placed into question by Mr. Santangelo's concerns about his client's ability to take the stand. In his affidavit, Mr. Santangelo indicates that, in light of Mr. Gambino's difficulty recalling details and his stamina and concentration problems, he had concluded that he "absolutely [could not] put Mr. Gambino on the witness stand to testify in his own defense." Santangelo Affidavit, at ¶ 7. Mr. Santangelo did not indicate that he would have called Mr. Gambino to the stand absent these problems, but rather simply stated that "[w]ith a defendant in better physical and mental health ... I would want to discuss with my client the *possibility* of testifying in his own defense. However, I absolutely would not consider that with Mr. Gambino." *Id.* at ¶ 10 (emphasis added).

There are many factors involved in making the strategic assessment of whether or not a defendant should take the stand in his own defense. In advising their client on this issue, trial lawyers often consider various factors including the defendant's intelligence, his cognitive and communicative skills, his ability to withstand the crucible of cross-examination, and the general impression that the defendant is likely to make upon the jury. While there may have been many strategic reasons counseling against John Gambino taking the stand in a case of this nature, Mr. Santangelo concluded that he could not even consider having Mr. Gambino take the stand given Mr. Gambino's purported physical and mental condition.

The Second Circuit has emphasized that "[i]t is well-established that some degree of mental illness cannot be equated with incompetence to stand trial." *United States v. Vamos,* 797 F.2d 1146, 1150 (2d Cir.1986) (citing *Hall v. United States,* 410 F.2d 653, 658 (4th Cir.), *cert. denied,* 396 U.S. 970, 90 S.Ct. 455, 24 L.Ed.2d 436 (1969)), *cert. denied,* 479 U.S. 1036, 107 S.Ct. 888, 93 L.Ed.2d 841 (1987); *see also Newfield v. United States,* 565 F.2d 203, 206 (2d Cir. 1977) (" 'It does not follow that because a person is mentally ill he is not competent to stand trial' ") (quoting *United States v.*

*Adams,* 297 F.Supp. 596, 597 (S.D.N.Y. 1969)). Therefore, the Court notes that the fact that a defendant may have certain intellectual or cognitive problems which would lead his attorney to conclude that it is in his best interest not to take the stand does not inevitably lead to the conclusion that he was incapable of taking the stand and thereby unfit to stand trial. Based upon the credible medical evidence and the Court's own observations, the Court concludes that John Gambino had sufficient memory to recall the relevant events discussed in the trial and could communicate his thoughts to the jury and, therefore, possessed sufficient mental capabilities to take the stand in his own defense if he chose to do so. Thus, while trial counsel for John Gambino had apparently concluded that certain medical problems made it unwise to have Mr. Gambino testify in his own behalf, it is the Court's conclusion, based upon the relevant evidence, that such problems clearly did not render Mr. Gambino mentally incompetent to take the stand or otherwise prevent him from meaningfully assisting in his own defense.

### (2) Physical Ability to Stand Trial

In addition to arguing that he was mentally incompetent to take the stand, John Gambino also argues that his heart ailment made him physically unfit to testify in his own defense. In support of this argument, John Gambino cites the 1990 report of Dr. Simon Dack which concluded that, with respect to John Gambino's ability to testify at a deposition or at trial, "[t]here is a high risk that the stress associated with such questioning and cross-examination would lead to acute coronary insufficiency and chest pain, rapid heart rate due to aggravation of this atrial fibrillation and symptoms of acute cardiac disability." Report of Simon Dack, M.D., dated November 30, 1989, annexed as Exhibit C to the Pollok Affidavit, at 2. In addition, Gambino relies on the conclusions of his *psychiatrist* that his heart condition precluded his from testifying in his own defense. Hearing Transcript, at 50–51.

The Court fully addressed the issue of John Gambino's heart ailment in the Court's denial of the pretrial motion for a medical severance based upon, *inter alia,* his heart condition. The Court's detailed findings with respect to the severance motion will not be repeated for purposes of this motion. *See United States v. Gambino,* 809 F.Supp. 1061, 1076–79 (S.D.N.Y.1992). However, the Court would like to discuss briefly the updated medical evidence which was submitted to the Court subsequent to the Court's decision on the medical severance issue which further supports the Court's initial determination that John Gambino was physically fit to stand trial and take the stand in his own defense.

At the Court's direction, a cardiologist, Dr. Ira Cliff Schulman, examined John Gambino on December 23, 1992 to update his heart condition and to recommend any specific precautionary measures, if any, which the Court should take during the course of the trial. Dr. Schulman determined that "[o]verall Mr. Gambino appears to be in stable medical health." Report of Ira Cliff Schulman, M.D., dated December 23, 1992. Dr. Schulman also noted that "[h]is physical examination was essentially unchanged from that of the original consultation of November 3rd [of 1992]." [12] *Id.* Based upon this examination, Dr. Schulman concluded in late December 1992 that Mr. Gambino was stable enough from a cardiac standpoint to withstand the stresses of trial. *Id.* Thus, the updated medical evidence confirmed the conclusion of the Government's physician, Dr. Weld, in 1990 that John Gambino's stress tests and exercise regimen indicated that he was physically fit to stand trial and engage in trial proceedings of any nature. *See* Report of Francis M. Weld, M.D., dated July 10, 1990 (Annexed as Exhibit A to the Comey Affidavit).

The Court finds this updated medical evidence to be credible and, thus, concludes that Mr. Gambino's heart ailment, and other medical conditions relating to his stroke in 1985, did not preclude him from taking the stand in

---

12. After the November 3rd examination and consultation, Dr. Schulman had concluded that "Mr. Gambino is fairly stable from his cardiac standpoint" and recommended certain alterations in his medications. *See* Letter of Ira Cliff Schulman, dated November 17, 1992, at 2.

his own defense. This strong medical evidence completely undermines the conclusions of Dr. Dack in 1990 which indicated that John Gambino would risk cardiac problems if he were to testify in his own defense. Moreover, the Court finds that, in light of the medical evidence and conclusions rendered by Government doctors over the past three years, the conclusions of John Gambino's psychiatrist, Dr. Goldstein, relating to Gambino's heart condition and the potential risks of testifying at trial carry little, if any, weight. Finally, both the Court and the doctors at the MCC closely monitored John Gambino's health during the entire length of the trial to ensure that no medical problems developed. Therefore, the manner in which the trial was conducted further alleviated any potential health risk posed by John Gambino's participation in the trial, including taking the stand in his own defense.

In sum, the Court has weighed the conflicting medical evidence relating to John Gambino's physical ability to take the stand and, based upon the credible medical evidence offered by the Government, finds that Mr. Gambino could have taken the stand without posing a substantial danger to his life or health. It has been noted that "[t]he fact that [a trial] is by its nature ordealistic cannot abrogate the public interest in bringing those accused of criminal misconduct promptly to account." *United States v. Brown*, 821 F.2d 986, 988 (4th Cir.1987).

### CONCLUSION

Having considered the various factors—including the conflicting medical evidence, the Court's own observations, the statements of John Gambino's trial counsel—the Court finds that John Gambino was mentally competent to stand trial. In addition, with respect to his physical problems, the Court also finds that Mr. Gambino's heart problems did not prevent him from taking the stand in his own defense if he chose to exercise that right, nor did it affect his ability to participate in the trial and to assist his attorney in a meaningful way.

Accordingly, the Court denies John Gambino's motion requesting that he be declared incompetent to stand trial.

The Court notes that, while this finding of competency is made in response to a motion brought during the first trial which has already been completed, the Court's ruling also applies to John Gambino's retrial on the remaining counts. Therefore, another renewed competency motion by John Gambino prior to the upcoming retrial will be unsuccessful unless the Court is presented with new medical data or other evidence which requires the Court to reconsider its detailed findings set forth above concerning his mental and physical ability to stand trial.

**SO ORDERED.**